# Ernest Villarreal vs. Formosa Plastics Corporation, Texas

# *Burgin, Shane 11072018 Vol 1 of 1*

### *11/7/2018*

**Annotation Digest - All Annotations**

**Prepared by:**

tjhuh
Marek, Griffin & Knaupp

Tuesday, November 13, 2018

## TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 4 Ln: 4 - 20**

**Annotation:**

Q    Please state your name.

A    Stephen Shane Burgin.

Q    And tell us a little bit about your background. Where were you born and raised?

A    I was born in Spohn Hospital, Corpus Christi. I spent three years -- my first three years of life on Welder Ranch in San Patricio, where my father was a foreman for a few years, and my dad and mom divorced. He moved to Houston, and my mom back to where she was born and raised, which was Woodsboro, and she married a farmer.

We lived for 13 years out on the farm near Bayside and enjoyed a great childhood of fishing on Copano and hunting anywhere you wanted to, played football, graduated from Woodsboro ISD back when we won district champions and playoffs and had a good life, graduated 1985.

**Pg: 5 Ln: 17 - Pg: 6 Ln: 17**

**Annotation:**

Q    All right.  And then what was your next section of life?

A    I went off to TLC.  I played football first semester, blew out my shoulder, and then I had to redirect my plans and went and did a little stint in Lubbock at Texas Tech, which I loved.

I was poor, because after that 13 years on a farm, my mom and stepdad divorced.  I worked my way through college, and I was working as a landman in the Panhandle and going to school, discovered what I wanted to do, which was environmental management, a special science, and looked around and there was an opportunity to continue working and getting the degree at the same time at the University of Houston-Clear Lake, and so I transferred to Houston, finished out there, married my wife from Woodsboro, Angie, and we have been together ever since.

Q    And how long have you all been married?

A    26 years this year.

Q    You got kids?

A    Yes, two.

Q    And what are their ages?

A    Dara, my daughter, is 24 and she's a trauma IC nurse at UT Medical Center in San Antonio, and my son is a junior in the engineering -- electrical engineering program at UTSA.  He's going to be 21 in November.

## TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 6 Ln: 18 - Pg: 9 Ln: 11**

**Annotation:**

Q   Well, congratulations on both of those youngsters.  That's great.  I had one other question I was going to ask you.  Oh, I remember what it was.  So you have a collection of education from high school in Woodsboro, educated at Texas Lutheran, Texas Tech?

A   Yes.

Q   And U of H?

A   Yes.

Q   And your degree is?

A   Environmental Science.

Q   Environmental Science from U of H in Clear Lake?

A   Yes.

Q   Cool.  And what was your first job after you got your degree from U of H?

A   Well, let's see, while I was going there, I moved from the oil field and started working as an environmental technician for a company called Corrigan Consultant, environmental consultant.  They were out of Seabrook and doing ground water well, monitoring, things of that nature.  Really had me fired up while I going into that, and then after I graduated, I landed my first real job with Brown & Root, Inc., their corporate office, downtown Clinton Drive in Houston, 5th Ward, as their environmental compliance specialist, worked there until 1994.

My wife and I, we had our first child and quickly realized -- and she's an RN also working at St. Luke's, and I was downtown.  So it didn't matter if I drove from Friendswood or Katy.  Both was bad, and so both she and I were from Woodsboro, and we knew we wasn't meant to raise a child.  So we said we're not going to let somebody else do that, we're going to.  So we said we have to get out of Houston, and so I put in a job application at Formosa, went to work for a man.  You probably know him, named Bob Wallace.

Q   Sure.

A   And I went to work there as an environmental engineer, was the job title.  Worked my way up to environmental management and then eventually took over the safety department in 1999, and I'm the safety director today of that process, safety management, risk management, health and safety, security, emergency response and EOT.

Q   Shane, what was the spark that got you interested in environmental safety and that sort of work?

A   Environmental side was, I guess, just in my nature to the core.  I grew up in the country.  I had more cows as neighbors than I had people, humans, and I

## TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:**  [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 6 Ln: 18 - Pg: 9 Ln: 11** continued...

**Annotation:**

8:18  just enjoyed that life, and I thought there was a reason
to protect it.
                    I love Texas history, and so I'm proud of
Texas and want to keep it that way, and I saw an
opportunity.  There was this EPA, and at that time, it
was Texas Water Commission ramping up on their
regulations, and it just sounded like something I wanted
to do, be a part of, and then once I got into the
9: 1  environmental, I started paying more attention to people
and realizing, you know, whether I stayed with Formosa
or go somewhere else, I would like to be able to do it
all.
                    A lot of companies have just one or two
people and they do environmental health and safety, and
so my initial thought about going into it was I wanted
to expand my knowledge and experience and regulatory
side of things, and then once I got into it, I found out
I really liked it and I was good at it, and so that's
where I am now.

**Pg: 10 Ln: 22 - Pg: 11 Ln: 10**

**Annotation:**

10:22        Q    Well, good.  And how many years have you been
at Formosa?
        A    Golly.  Well, I surpass the 75 point minimum to
retire.  I guess it's cumulative from '94 to now,
11: 1  whatever that adds up to.  I guess 25, 26 years.
        Q    25.  Well, as we sit here today, what is your
official job title?
        A    Safety director.
        Q    All right.  And then Formosa's chain of
command, if you will, who do you report to?
        A    John Pastuck.  He's the senior director in New
Jersey.
        Q    Okay.
        A    I'm solid line to him.

**Pg: 11 Ln: 17 - Pg: 12 Ln: 23**

**Annotation:**

11:17        Q    Okay.  All right.  And over the 25 years you've
been at Formosa, have you developed friendships and
relationships with lots of folks?
        A    Yes.
        Q    Let me just ask you this:  How long have you
known Ernest Villarreal?
        A    I met him not long after I got there, say, mid
'90s.  In 1994, my wife and I bought our first new
vehicle together.  August 3rd, 1994, my birthday, as a

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

---

**Pg: 11 Ln: 17 - Pg: 12 Ln: 23 continued...**

**Annotation:**

matter of fact, is when I bought it, and it was one of the new sports side Chevrolets. It was white and it was unique because it had the kind of a burgundy red interior seat.

Q    A burgundy red?

A    Burgundy red. It was unique, because that's how Ernest began to know me. He always refers to me as Burgundy. He has a name for everybody, not their God-given name. It's just something else, you know, something else, but he took a liking to that truck, and the first time I met Ernest, I was pulling in the parking lot, and he hollered at me, "Hey, you want to sell that truck?"

And I turned around and I looked, "Okay, who are you?" I thought at the time, "Who is this loudmouthed guy?" because he was hollering at me.

Q    Yeah.

A    I later discovered, well, he hollers at everybody, because he can't tell how loud he's speaking, but that's how I met Ernest, and so we were acquainted just through that time, and then I would say more in the 2000 range we became friends and got to know him a lot better and got a lot of respect for him, good man.

---

**Pg: 12 Ln: 24 - Pg: 13 Ln: 14**

**Annotation:**

Q    What are the qualities about you -- about him that you observed over the years?

A    Well, you know, the quality is number one. He's an extremely hard worker, probably one of the hardest working men that I've ever met, because I have witnessed him work off the job and hours, longer hours than most people would be willing or want to work. He was -- I would describe him as a workaholic in a lot of respects, but he enjoys those things, and especially certain types of work.

He really is a handyman. He's a jack-of-all-trades and really got close to him, because when I was ranching, you know, I had electrical needs and I'm not an electrician. I don't like electrical. That's what makes me a good safety man. I'm concerned about all hazards.

---

**Pg: 13 Ln: 15 - Pg: 15 Ln: 1**

**Annotation:**

Q    You know what to avoid?

A    I know. I try hard to keep people away from those things unless you're qualified, and he was

---

## TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 13 Ln: 15 - Pg: 15 Ln: 1** continued...

**Annotation:**

certainly qualified, and we just got to build a friendship, you know, and found we had similar interests and some things different.

He's not a hunter or fisherman, didn't have the patience for it, but I found that he's a good, Christian man. He grew up a tough life, much similar to mine, broken family, different challenges, and he wasn't educated to the point of meaning I know he didn't go to college. I'm not even sure he finished his high school education, and I learned that because I asked him one day. We was out -- it well after dark. We were doing electrical work in the shop that I built, and I said, "Where did you get your degree at? Where did you go to college?"

Q   This was at the plant you're asking him this?

A   No, this was at home, my ranch. He was out working, helping me do some electrical work. "Where did you get your degree?" It shocked him.

MR. FARMER: The question is about not the electrical.

THE WITNESS: What's that?

MR. FARMER: That the question shocked him, not the electrical work.

THE WITNESS: Oh, yeah, good point. It surprised him, would be another way to put it. "Why are you asking me that?"

"Well, it's a logical question. You're obviously very good at this. You're smart."

You know, he told me, he said, "No one has ever asked me that," and then he told me the story, and I thought, "Wow." I would have never guessed that he was hardly illiterate from the standpoint of being able to read and write, like what an educated person would be.

**Pg: 16 Ln: 2 - Pg: 17 Ln: 23**

**Annotation:**

Q   And let me just ask it in this way: The journey that led to Ernest's being told that he would be moved from his unit at VCM where he had been working over to utility maintenance, did Ernest confide in you about what was going on?

MR. FARMER: Objection, compound, lack of foundation.

THE WITNESS: Yes.

Q   (By Mr. Griffin) Okay. And is that the sort of thing that as friends you guys would talk about?

A   Yes.

Q   And let me just ask you this: Is it -- well,

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 16 Ln: 2 - Pg: 17 Ln: 23** continued...

**Annotation:**

let me just ask it in this way:  First, is it true or not true that Formosa's HR director, Bill Laas, actually called Ernest a fat, lazy Mexican in your office?

A   Yes.

Q   All right.  And is it also true that he called him that within earshot of another gentleman by the name of Sammy Grimaldo?

MR. FARMER:  Objection, calls for speculation.

THE WITNESS:  It's possible.

Q   (By Mr. Griffin) And who is Sammy Grimaldo?

A   He's my manager.

Q   Okay.  A person of integrity?

A   Yes.

Q   A truthful person?

A   Very much so.

Q   So given your position, you probably know nobody can get you in any trouble?

A   Yes.

Q   For testifying truthfully about what happened to Ernest?

A   Yes.

Q   Okay.  So let me just ask you to set the table for us and tell us what happened, first, the context of the meeting, and what happened during that meeting with Bill Laas?

A   Okay.  Bill Laas and I had several meetings or discussions, even on the phone, regarding this case with Ernest.  So are you asking me about the meeting which he actually made that statement regarding Ernest?

Q   First, let's set up that meeting.  If we could, set the table for us in terms of approximately when was it?  Was it after that Formosa told Ernest he's going to need to go out to utilities after -- just trying to set the table when that was.

**Pg: 17 Ln: 25 - Pg: 20 Ln: 1**

**Annotation:**

THE WITNESS:  It was between the time, because I don't remember the calendar day, but it was between the time that I was asked the question, "Did I know Ernest was deaf?"

And the time that Ernest informed me that he was being transferred to cogen, Bill was in my office.  Ernest's situation became a big issue quite quickly.  I'm sure what Bill and I were talking about at the time was okay.  We have this situation now that we're aware of.  We know he's hard of hearing.  I'm now aware of a job description that I had never seen before

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 17 Ln: 25 - Pg: 20 Ln: 1** continued...

**Annotation:**

that had this 40-decibel minimum requirement because it did not come from us or me.

Q    Right.

A    And I was aware that he had been, at that point, been accommodated by his manager, Rey Tuazon, and apparently had been accommodated for some time --

Q    Right.

A    -- maybe up to two years, and based on what I was looking at, from a safety standpoint, from a risk point of view.

Q    Which is what you are about?

A    What I do every day.

Q    Right.

A    That my point in what I had said to Bill, "Is what is the big deal?  What is wrong with him being able to work in that shop if his manager is accommodating him in that way?"  Because he's clearly earning his money. He's not in a high noise area.  We don't have to worry about this requirement of 40 decibels, because that's for the process unit, not where he's working, because it's a non-mandatory hearing protection required area. He's at no risk for losing his hearing or making it worse, and that's when Bill said what he said.

Q    And if I understood what you said, Bill also said to you, "Don't you know Ernest is deaf?" or some words to that effect?

A    Yeah, it was before that meeting.

Q    How did you take it when he asked you as a person who has known Ernest for 20-plus years, "Don't you know he's deaf?"  How did you take that?

A    Well, it set me back because, of course, I know he's hard of hearing.  At the time, it wasn't a matter of whether that's a clinical definition or not, because I don't know if there is a clinical definition for deaf, as opposed to I know what clinical definition would be for blind, but subjectively, yes, he's very hard of hearing, but what I said is, "Why are you asking me that now?  Everybody knows -- anybody that knows Ernest knows he's hard of hearing."

Q    Sure.

A    Including Bill Laas.

**Pg: 20 Ln: 23 - Pg: 22 Ln: 24**

**Annotation:**

Q    (By Mr. Griffin) Let me just ask you this:  Not only did you suspect something else was going on, as I understand it, Bill Laas got into a disagreement with you --

A    Yeah.

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

---

**Pg: 20 Ln: 23 - Pg: 22 Ln: 24** continued...

**Annotation:**

Q    -- about Ernest continuing to be accommodated in the way that he was?

A    Yes.

Q    Okay.  And if I looked at this job -- I was looking at the job description, which has been marked previously as Laas Exhibit No. 5, and it seems that what the accommodation that Mr. Tuazon, and perhaps Mr. P.H. Hang, had granted to him years before would have been they moved him to a location where he wasn't subject to his noise causing reason to shout in order to be heard above the noise?

MR. FARMER:  Objection.

Q    (By Mr. Griffin) Is that what your understanding of the accommodation was --

MR. FARMER:  Objection.

Q    (By Mr. Griffin) -- to get him away from that condition?

MR. FARMER:  Compound.  Assumes facts not in evidence, also speculation.

THE WITNESS:  From discussion with Bill, that was the reason it was made.  From discussions with Ernest, that's the reason he said he was moved over there, and so it was the part in that job description above that section that you were pointing out is what concerned me.

Q    (By Mr. Griffin) Sure.

A    Because I had not ever seen that before until that day.  So learning about his accommodation, learning about the things that he was doing over there, and just some assumptions that I was making that if management approved him to go there, and he's been there for two years, what's the big deal?  And that was the comment that I made to Bill.

He's obviously earned his money over there.  Why do we want to press this issue now when everybody knows that he is hard of hearing, including his boss, which must be the reason he moved him there, and that's when Bill said, "You ain't shitting me.  I know what he's doing over there.  He's a fat, lazy Mexican sitting on his ass."

And so I'm sitting there, "Of course, okay.  Now, I know there's something else going on here," and that -- the door was open when he said it, because Bill had already stood up, and he's standing like here (Indicating), like two chairs in front of my desk, and he's sitting over there and he's already stood up, had his cowboy hat on, and proceeded to walk out.

---

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 23 Ln: 18 - 21**

**Annotation:**

Q    (By Mr. Griffin) Okay.  Let's break it down to he expressed the view that this accommodation that he had been granted, that it was viewed that the accommodation showed that he's just lazy?

**Pg: 23 Ln: 24 - Pg: 24 Ln: 11**

**Annotation:**

THE WITNESS:  That's how I interpreted what he was saying, by saying that he was sitting on his ass, that the point of potential was, "What's the dig deal? He's there.  He's safe, low risk.  I know he's near retirement.  He's been here for 30 something years.  Why now?"

So if this was really about him sitting on his ass, that means to me he's not earning his money, because that would be a normal phrase to state when someone is sitting on their ass instead of working.

Q    (By Mr. Griffin) The way Bill Laas characterized the accommodation that had been granted to Ernest years before, that was his view of it?

**Pg: 24 Ln: 15 - Pg: 25 Ln: 13**

**Annotation:**

THE WITNESS:  At least I interpreted that that is his view of it at that time when we were having the discussion.  I don't know if he thought he was always doing that for two years, sitting on his ass, but certainly, based on what I was asking, because, of course, I had -- after I found out about the job description, after I found out about his reassignment -- Ernest's reassignment, I talked to Ernest.  I said, "What are you doing over there?  Are you actually assigning --" he told me about all the things that Rey had him doing, that Mike Labay had him doing, his supervisor.

Q    (By Mr. Griffin) You mean doing the inspections, route checks?

A    Working on the equipment in the shop, you know.

Q    Yes, primarily.

A    Rebuilding motors and things of that nature, and that sounded like a logical thing, sounds like Ernest, which he would be good at.  That doesn't sound like somebody who's sitting on his can.

Q    Right.

A    And so, you know, I had an opinion that disagreed with Bill about what he was saying, or at least insinuating that Ernest wasn't earning his money.

# TextMap Annotation Digest Report

Case Name: Ernest Villarreal vs. Formosa Plastics Corporation, Texas
Transcript:  [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 25 Ln: 22 - Pg: 27 Ln: 1**

**Annotation:**

Q   (By Mr. Griffin) What was he trying to get you to do?

A   It was -- well, my role would be, okay, I'm over medical. We have an employee who has a job description that he's not meeting, and he has a condition now, because we -- I had a medical need to look at his hearing test records that we have on him annually to see how he measured up to this 40 decibels that we see written in his job description.

My role would be to determine if Ernest is fit to work in the job that he was hired for. Bill made it clear to me what our point of contention was, is that management cannot make an accommodation like that without HR's working knowledge.

Q   And he's upset that he wasn't involved?

A   Well, yeah.

Q   Okay.

A   Yes. But you don't have to be upset about things that you are aware of, you know, that this accommodation has been going on without his knowledge. I don't know if Bill Laas would have approved that accommodation if management had come to him with that decision, but it's not Bill Laas' decision. It's the manager's decision to make whether to accommodate. When we accommodate, -- and we to every day -- we don't go to Bill Laas and ask for permission.

Q   Right.

A   That's what seemed very unusual, and I was very suspicious about why is he picking on this? What's the big deal?

**Pg: 27 Ln: 24 - Pg: 28 Ln: 2**

**Annotation:**

Q   (By Mr. Griffin) But what you do know is that he was adversarial with Ernest in the meeting about his hearing ability?

A   Yes.

**Pg: 28 Ln: 5 - 10**

**Annotation:**

Q   (By Mr. Griffin) And that he in that conversation called him deaf?

A   Yeah.

Q   And, Shane, in truth, it's not fair to say Ernest is totally deaf, is it?

A   Not fair.

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 28 Ln: 13 - 21**

**Annotation:**

Q   (By Mr. Griffin) In other words, for example, he can hear.  He just has a profound hearing loss. Isn't that the truth?
A   That's the truth.
Q   Okay.  All right.  And not only did he call him deaf in this conversation with -- in the conversations with you, he called him a fat, lazy Mexican; is that right?
A   Yes.

**Pg: 28 Ln: 23 - Pg: 29 Ln: 5**

**Annotation:**

Q   (By Mr. Griffin) In your 30-plus years of working after school, ever heard an HR manager anywhere on this planet call a worker that kind of name?
MR. FARMER:  Objection, calls for speculation.
Q   (By Mr. Griffin) I mean, other than Bill Laas?
A   I don't recall a case where an HR manager referred to someone in that regard or in that way.

**Pg: 30 Ln: 7 - 14**

**Annotation:**

Q   (By Mr. Griffin) From your perspective as a safety person, is that something you want to see co-workers do in situations where workers have disabilities to work as a team to be able to accommodate someone who has a disability such that safety is put first?
MR. FARMER:  Objection, vague.
THE WITNESS:  Absolutely.

**Pg: 30 Ln: 17 - 22**

**Annotation:**

Q   Is there anything -- in your mind, the person who is interested in safety, was there any problem with Mr. Lahodny's supervisors and co-workers apportioning responsibilities, at least insofar as climbing tall vessels and Allen working the control board?  In your view, does that promotes safety?

**Pg: 31 Ln: 1 - Pg: 32 Ln: 19**

**Annotation:**

THE WITNESS:  It characterizes the essence of safety on many levels.  Number one, is that we want fit employees.  We also require experience and knowledge

## TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 31 Ln: 1 - Pg: 32 Ln: 19** continued...

**Annotation:**

31: that, in my mind, we are able to run a safer operation by having experienced people working, even if they're not able to perform all of the duties that they once were.

I certainly promote retention of employees. I have absolutely no problem with a 65- or 70-year-old man working out there, comes from wisdom. So making those accommodations are important, because while at the same time we want the knowledge and experience, we don't want someone that has certain disabilities, certain conditions that, if not managed, could potentially manifest into a work-related injury.

My job as management for the discipline in workmen's comp is to try to prevent injuries from occurring, and so certainly if someone has the inability to lift 50 pounds based upon the treating physician restriction, I certainly don't want that individual put in the position to have to lift 50 pounds.

Q   (By Mr. Griffin) Sure.

A   If management can accommodate to where the employee is able to work and not have to perform that duty, then absolutely I support that, which is why from a work-related case, if somebody was injured at work, we try to encourage management to accommodate that individual so they do not have to go on short-term or restricted duties. We do that every day.

From just purely as a human standpoint, because we have experienced people working for us with age, some time, I guess the past year, there were roughly 800 people of our total 2,300 employees who are 50 years of age or older, me included. When we have a 20-year-old man that's working in the same vicinity of a 70-year-old woman, you would have the 20-year-old man lift a box copy paper, make accommodation.

Q   Sure, makes sense.

A   And it's just the right thing to do.

Q   Were you made aware that in the situation with Mr. Lahodny that Bill Laas got upset that Allen's co-workers were doing the tall climbing and allowing Allen to work the control board during those periods of time?

**Pg: 32 Ln: 22 - Pg: 33 Ln: 14**

**Annotation:**

32: THE WITNESS: That does ring a bell. I don't remember why or how I became aware of that. I think Bill learned about that accommodation, maybe about some others, and he and I had subsequent conversations about accommodation, including Allen, and he

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 32 Ln: 22 - Pg: 33 Ln: 14** continued...

**Annotation:**

acknowledged that accommodations were made out there every day, but when HR is made aware of accommodations being made, his job is to ensure consistency. From a management standpoint, I understand that.

Q   (By Mr. Griffin) Let me just ask you this:  In speaking with Mr. Laas, -- and I have spoken with him a couple of times -- he has shared that they don't keep any records of accommodations to ensure consistency, that their HR department just doesn't have any records on accommodations, but did Bill Laas -- how did Bill Laas share with you how they could have any consistency in HR, unless they keep some records of how they accommodate workers?

**Pg: 33 Ln: 18 - Pg: 34 Ln: 13**

**Annotation:**

THE WITNESS:  In general, the conversations that I've had with Bill about consistency is that we don't want one department making an accommodation for an employee, make an exception for one, but then another employee in the same department not having the same accommodation.  The lack of consistency there could result in complaints and things of that nature, say discrimination.  That was the way it was presented to me.

And from a management standpoint, I understand the benefit of that.  When we can accommodate, we absolutely should, but if you, for whatever reason, you know, if you had like-kind conditions, someone had the same condition, you make an accommodation for one, but not the other, that could be a problem.  How HR manages that, I have no idea, but I know from our conversation with Bill that he can only manage what he's aware of.

Q   (By Mr. Griffin) Let me ask you this:  Did Bill ever express to you any basis for belief or explain his beef with accommodating workers with disabilities?

**Pg: 34 Ln: 19**

**Annotation:**

THE WITNESS:  No.

**Pg: 35 Ln: 17 - Pg: 36 Ln: 3**

**Annotation:**

Q   (By Mr. Griffin) Have you and he also talked about the case of the gentleman who suffered a contact dermatitis because of interaction with pellets at the

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 35 Ln: 17 - Pg: 36 Ln: 3** continued...

**Annotation:**

plant?  I believe his name was Mr. Rudy Carreon.
          MR. FARMER:  Objection.
          THE WITNESS:  Rudy Carreon?  Yes.
     Q   (By Mr. Griffin) Did Bill ever have any
conversation of you -- with you about why Formosa
couldn't move him to a unit away from the pellets that
were causing his contact dermatitis?
          MR. FARMER:  Objection, irrelevant.
          THE WITNESS:  No.

**Pg: 36 Ln: 4 - 7**

**Annotation:**

     Q   (By Mr. Griffin) Okay.  How would you describe
the tone of voice and the mannerisms that Bill exhibited
to you in your presence about Ernest in the way that he
was called a fat, lazy Mexican?

**Pg: 36 Ln: 10 - 25**

**Annotation:**

          THE WITNESS:  Bill was angry, would be how
I would describe his demeanor.  It may be that I caused
him to reach to the level of anger, based on my
disagreement with how we were approaching it, because I
felt like we were about to step in it, and because I
was, at that time also knowing, and I told Bill, "You
know that if we go down this road, we have other
employees out there that have the same condition that
Ernest does, and that it's going to result in throwing
people out of work that have been here for a very long
time."
     Q   (By Mr. Griffin) In any conversation with Bill
Laas, at any point in time up today, has he ever offered
you any coherent explanation for the directive that
Ernest be moved from his current job over to utility
maintenance?

**Pg: 37 Ln: 3 - 18**

**Annotation:**

          THE WITNESS:  I don't recall ever having
that conversation.  I became aware of it from Ernest,
and confirmed that Ernest had heard something when I
talked to the general manager and vice president about
it.  I did not go to Bill Laas, because at that point,
when I heard about it, I already knew Bill, for whatever
reason, was not going to change his mind.
     Q   (By Mr. Griffin) Okay.  But for the benefit of
us, I want to make sure we understand, Bill did not have

## TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 37 Ln: 3 - 18 continued...**

**Annotation:**

37:12 a discussion with you about the appropriateness or not
of ending Ernest's accommodation and putting him over in
utilities?
A    No.
Q    Okay.
A    And I believe that was because he knew I would
completely disagree with that.

**Pg: 38 Ln: 12 - 16**

**Annotation:**

38:12    Q    (By Mr. Griffin) When Ernest was going through
this, did Ernest share with you that one of his
co-workers had shown him an email where he was or the
email said that as of the next day he was to be moved
over to utility maintenance?

**Pg: 38 Ln: 18 - Pg: 39 Ln: 5**

**Annotation:**

38:18                THE WITNESS:  So some time after Bill and I
had the disagreement, and we had more than one, Bill and
I had concerning this, Ernest came to my office and
informed me that he was just informed that he was being
moved.  I am aware that there was an email.  I don't
recall reading it, but Ernest told you about it.  He
told me about it.
Q    (By Mr. Griffin) Sure.
A    So that was when I became conscious that there
was something going on here, and I went to the general
manager.
Q    And the general manager being?
A    Rick Crabtree.

**Pg: 40 Ln: 13 - 17**

**Annotation:**

40:13    Q    What does it tell you as the director of safety
that a person who does have severe hearing loss could
successfully perform their job duties and get good
evaluations, despite having hearing loss way greater
than 40 decibels in each of his speech frequencies?

**Pg: 40 Ln: 22 - Pg: 42 Ln: 19**

**Annotation:**

40:22                THE WITNESS:  Well, I wouldn't be able to
say that from a safety standpoint, but from a management
standpoint, I would say that if I have an employee
that's performing quite well, in spite of their

## TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

---

**Pg: 40 Ln: 22 - Pg: 42 Ln: 19** continued...

**Annotation:**

disability, it's a good employee.  It doesn't matter what their condition is if it's productive in performance.  It matters as management.

From a safety standpoint, it just tells me that the management has found that the employee is safe to work.  If the employee is not a risk to himself or others, you know, but again, within the scope of whatever they have him performing.

Q    (By Mr. Griffin) Shane, in terms of common sense and your knowledge out at the plant, did it make any rational sense to take Ernest out of the working environment that he had been in after having been accommodated and moved out into the field of utility maintenance?

A    Absolutely not, which is why I went to go see Rick Crabtree instead of Bill.

Q    You went over Bill's head?

A    Absolutely.

Q    Okay.  And what did Crabtree say?

A    I went to Rick's office, and I had more than one thing to go talk to him about, because it's a dotted line to report to the general manager and vice president, Rick Crabtree.  So he and I we went together daily.

I went to him, and I said, "Look, it's my understanding that someone has made a decision to move him -- move Ernest to cogen, and we've obviously lost our F'ing mind, because that is the loudest units we have out here."

Q    Right.

A    "What we already know about his condition and what were discovery, we're asking for it.  He's going to sue us."

And so Rick told me that, "No, we're not moving him to cogen.  We're gonna move him to wastewater."

So that was my confirmation that someone actually is planning to move Ernest, but there's a big difference between wastewater and cogen in terms of the noise level, the ambient noise level and the noise surrounding the equipment, big difference, but whether Ernest misunderstood or someone misunderstood and told him he was going to cogen or maybe Rick misunderstood, I never did find that out.

---

**Pg: 43 Ln: 1 - Pg: 44 Ln: 3**

**Annotation:**

Q    (By Mr. Griffin) In either place, utility maintenance and wastewater, or the other one?

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 43 Ln: 1 - Pg: 44 Ln: 3** continued...

**Annotation:**

A    Okay.  If we're comparing shop to shop, which is I'm saying the job that Ernest was performing at the time the issue was brought to the surface, he's not working in the unit.  He's only working in the maintenance shop.

All the maintenance employees are assigned to a unit based out of a shop, but they all go into the units to work every day.  Ernest -- the way it was explained to me is Ernest was exclusively working in the shop.

So the shop is not a high-noise area. You would not have to wear earplugs, for example, or earmuffs to work in the shop.  We would find very similar decibel readings for noise, if we compared the utility shop to the shop that Ernest was working in.

That is completely different to compare the shop where he's exclusively working to what he would have been working for his job description in VCM because that area is a high-noise area.  The shop that he was working in is completely different than if he went to the utilities shop and worked in the utilities cogen unit, which is what I was told could occur.

Q    Well, let me ask you this:  If the motive was not to set him up to fail over in utilities, why move him from the shop he had been working for years to a different shop in a different unit?  What's the point?

**Pg: 44 Ln: 6**

**Annotation:**

THE WITNESS:  That was my question.

**Pg: 44 Ln: 8 - 10**

**Annotation:**

Q    (By Mr. Griffin) And did they give you an answer?
A    No.

**Pg: 47 Ln: 1 - 14**

**Annotation:**

Q    (By Mr. Griffin) Okay.  Did Ernest share with you that between the time that he was shown the email that says he's going to utility maintenance and when he went to see Dr. Crowley, did Ernest tell you that he went to Bill's office and try to talk him out of it?
A    Yes, he told me that.
Q    And did he share with you that he tried to persuade Bill Laas by telling him utility maintenance is

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 47 Ln: 1 - 14 continued...**

**Annotation:**

47: 9  a lot louder than VCM?
A   Yes.
Q   And that Bill refused to change his mind and
told him he was going to go to utility maintenance, and
that was it?
A   That's what Ernest told me.

**Pg: 47 Ln: 22 - 25**

**Annotation:**

47:22      Q   Okay.  To this date, has anybody at Formosa
ever articulated any reason for stopping the
accommodation that he had been granted at VCM and moving
him to utility maintenance?

**Pg: 48 Ln: 3**

**Annotation:**

48: 3              THE WITNESS:  No.

**Pg: 48 Ln: 4 - 19**

**Annotation:**

48: 4      Q   (By Mr. Griffin) Now, if I understand part of
your role, you actually attempted to help Ernest get
back to work when he had taken disability leave on the
eave of him going over to utility maintenance?
A   Yes.
Q   Okay.  And Ernest had you to think for sharing
with him the advice to go get a hearing aid and go get
an audiologist to test your hearing?
A   Yes.
MR. FARMER:  Objection, calls for
speculation.
THE WITNESS:  Yes.
Q   (By Mr. Griffin) And from your knowledge, did
Ernest faithfully comply with that advice and get a
state-of-the-art hearing aid and improve his hearing?
A   Yes.

**Pg: 49 Ln: 14 - 24**

**Annotation:**

49:14      Q   (By Mr. Griffin) We talked about Bill Laas
calling him deaf.  We talked about Bill Laas calling him
a fat, lazy Mexican.  Were there any other criticisms
that Bill Laas made about Ernest in your presence?
MR. FARMER:  Objection, vague.
THE WITNESS:  Well, in my presence, I mean,
he's made the same statement to me twice, because

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:**    [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 49 Ln: 14 - 24** continued...

**Annotation:**

subsequent to that meeting in my office, we had a phone call and he used the exact same words to me again when I was trying to talk Bill into letting him stay there where he's at.

**Pg: 50 Ln: 13 - Pg: 51 Ln: 4**

**Annotation:**

Q    But if Ernest was being judged on his job performance and his evaluations and his productivity, can you think of a single reason why the accommodations should have been ended and him sent to utility maintenance?

MR. FARMER:  Objection, calls for speculation.

THE WITNESS:  There may be a reason to move him to utility maintenance that management in that area determines a need to fill.  People do move from shop to shop and job to job out there within the same, you know, site, just different units, to fill a need.

Q    (By Mr. Griffin) In other words, it would make sense if the two units talked to each other and satisfied a need by moving an hourly person from one unit to another?

A    Yes.

**Pg: 52 Ln: 4 - 17**

**Annotation:**

Q    (By Mr. Griffin) Well, let me ask you this:  In talking to Bill Laas, I guess day before yesterday, he accused Ernest of being a troublemaker and a pot-stirrer.  I just want to ask you in the 20-plus years you've known him, have you ever known Ernest to be a troublemaker?

A    No.

Q    Have you always known him in your years to be a hard worker?

A    Yes.

Q    A dedicated worker?

A    Yes.

Q    A loyal worker?

A    Yes.

**Pg: 53 Ln: 10 - 16**

**Annotation:**

Q    (By Mr. Griffin) Okay.  Other than Bill Laas, have you or anybody else at Formosa ever accused Ernest of being lazy?

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 53 Ln: 10 - 16** continued...

**Annotation:**

A    Never.

Q    Has anyone, other than Bill Laas, called to your attention the fact that Ernest is deaf?

A    No.

**Pg: 54 Ln: 2 - 23**

**Annotation:**

Q    (By Mr. Griffin) Right.  But in 2017, the United States Equal Opportunity Commission was made aware of what Bill had said to you, and Formosa was given an opportunity to respond.

In any of that process, did anybody at Formosa ever ask you, Shane, is it true or not true that Bill called Ernest those names?

A    No.  In fact, I was unaware of the lawsuit until Bill informed me of that.

Q    I want to show you what's been previously marked as Laas Exhibit No. 4, and I'll represent to you that this is a question that Formosa is supposed to answer under oath, and the question asked, "Please explain whether or not Formosa has investigated the allegation that Mr. Laas called Mr. Villarreal a fat, lazy Mexican, and please state whether or not the allegation is true or not true."  Do you see that?

A    Yes.

Q    I would like you to look at Formosa's answer and see if you can tell us whether Formosa ever truthfully answered the question of whether or not it's true or untrue what Bill said?

**Pg: 55 Ln: 1 - Pg: 56 Ln: 6**

**Annotation:**

THE WITNESS:  From what I read in there, the objection from Formosa is that it does not appear to answer the question.

Q    (By Mr. Griffin) Okay.  Had anyone at Formosa asked you at any point in time from the point that the EEOC asked them about it, would have told people at Formosa the truth, as you have stated it today, and told them exactly what Bill had said to you in person and on the telephone?

A    Yes.

Q    Up until I showed you this question, Shane, had anybody from Formosa showed you the question that we asked Formosa about whether or not it was true or untrue that Mr. Laas had called Ernest a fat, lazy Mexican?

A    No.

Q    I'm the first person to show you that question?

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

---

**Pg: 55 Ln: 1 - Pg: 56 Ln: 6** continued...

**Annotation:**
```
55:17       A    Yes.  I've never seen that or heard about it.
    18       Q    Okay.  And let me ask you about a few folks.
    19  Are you acquainted with Rey Tuazon?
    20       A    Yes.
    21       Q    What is your impression of him?
    22       A    He's smart.  From everything I've heard and
    23  demonstrated by his performance, he's very knowledgeable
    24  about electricity and knowledgeable about our electrical
    25  maintenance program.  That's what I know of him.  I may
56: 1  have an opinion of him, but, you know.
     2       Q    But you understand he's been one of the
     3  supervisors for Ernest?
     4       A    Yes.
     5       Q    Okay.  And that he likes Ernest as a worker?
     6       A    Yes.
```

**Pg: 59 Ln: 5 - 15**

**Annotation:**
```
59: 5       Q    Okay.  In terms of management at Formosa, what
     6  levels are Bill Laas and James Yeh in?  What levels are
     7  they in terms of management?
     8       A    There is no relation in the organizational
     9  chart, but James Yeh is higher in terms of rank than
    10  Bill is.  Bill is a manager.  He's an assistant manager
    11  or department manager or senior manager, but James is
    12  the director, which is higher.  You have to be a senior
    13  manager normally to make assistant director and then a
    14  director of the senior director, which director class
    15  James is in.
```

**Pg: 60 Ln: 3 - 10**

**Annotation:**
```
60: 3       Q    Right, but I'm not trying to beat on you or HR.
     4  I'm just -- having looked through 30 years of Ernest's
     5  audiograms, he's never been anything close to 40.  He's
     6  been more than 40 for 30-plus years, and I'm not beating
     7  anybody up over it, but the truth is he worked for --
     8  since the explosion in 1989 at that valve, when one of
     9  his ears was blown out, he's worked successfully out
    10  there, despite not meeting this standard; right?
```

**Pg: 60 Ln: 13**

**Annotation:**
```
60:13               THE WITNESS:  Yes.
```

---

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

---

**Pg: 60 Ln: 25 - Pg: 61 Ln: 21**

**Annotation:**

Q   (By Mr. Griffin) I don't mean to get into Rey's intent, but the accommodation that was granted to him to be working indoors primarily in the VCM unit and delivering the mail and other stuff that he did, that accommodation had the benefit of preserving the residual hearing that he still had left after the valve explosion?

MR. FARMER:  Objection, calls for speculation.

THE WITNESS:  Potentially, yes.

Q   (By Mr. Griffin) Okay.  And, likewise, the accommodation of working primarily indoors would be an acoustical environment that would allow him to hear better than in a noisy environment such as at utility?

A   Yes.

MR. FARMER:  Objection, calls for speculation.

Q   (By Mr. Griffin) Okay.  To this date, has anybody at Formosa articulated any -- I mean, besides Bill Laas -- articulated any criticism or opposition to Formosa's previous decision to accommodate him in the manner that Formosa did?

**Pg: 61 Ln: 24**

**Annotation:**

THE WITNESS:  No.

**Pg: 61 Ln: 25 - Pg: 62 Ln: 5**

**Annotation:**

Q   (By Mr. Griffin) Okay.  And in terms of your role with Ernest, had any worker, even one who was not a friend, sought your help in figuring out an accommodation for a worker with a disability, you would help them in the same manner, would you not?

A   Yes.

**Pg: 62 Ln: 23 - Pg: 63 Ln: 3**

**Annotation:**

Q   No, no, no, I understand.  In an effort to try to mitigate what was going on with Ernest and Formosa, you had actually gone to ask Diane Halepaska to email you the hearing standard that's in Formosa's job description?

A   I asked what is in the job description.

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

## Pg: 63 Ln: 25 - Pg: 64 Ln: 21

**Annotation:**

Q   Okay.  Gotcha.  But the reason why you were doing this was to try to be of help?

A   Well, certainly.  Well, I had a couple of things in my mind.  I wanted to help, but first I got to understand what I'm dealing with.

Q   Sure.

A   Because it's a fact that Ernest is hard of hearing.  It's a fact Ernest has shared it with me personally, privately, that he had to take certain steps on his own to work in high-noise areas because he couldn't hear.

For some reason, Bill Laas is angry about this situation, and I took it personal because the medical department works for me.  We do an annual hearing test every year.  So we have records showing what the test results are.

So how did I miss this?  How did this exist for all these years in his job description?  Because I've been in that job since '99, and Pat has been in his position longer than that, and neither one of us put that in that job description.  So it's been there a very long time.

## Pg: 68 Ln: 8 - 10

**Annotation:**

Q   (By Mr. Griffin) In other words, you understand that for many, many years he worked successfully, despite not meeting the 40-decibel rule; right?

## Pg: 68 Ln: 12 - 17

**Annotation:**

THE WITNESS:  Yes.

Q   (By Mr. Griffin) Okay.  And when Formosa became aware of it, Formosa discovered that this standard wasn't being enforced against any workers or 11 more workers?

A   Right.

## Pg: 68 Ln: 20 - 24

**Annotation:**

Q   (By Mr. Griffin) Fair enough.  Do you have any -- has Bill Laas ever shared with you any justification or defense of his failure to tell Ernest, "We're going to start enforcing this standard against you, unless you go get hearing aids"?

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

### Pg: 69 Ln: 3 - 5

**Annotation:**

THE WITNESS:  Bill Laas and I had in general discussions about that numerous times, which was the point of contention.

### Pg: 69 Ln: 12 - 21

**Annotation:**

Q  Well, what's wrong the accommodation?  Let's assume just for purposes of this conversation that P.H. Hang and Rey Tuazon and Sammy Saenz all knew about this, and said, "We're gonna put him a position where this standard doesn't really matter.  We're gonna put him inside where he's working in a better environment so that he's not subject to noise that causes people to have to shout in order to be heard above the noise"?  In an abstract, just a discussion, what would be wrong with that?

### Pg: 69 Ln: 23 - Pg: 70 Ln: 3

**Annotation:**

THE WITNESS:  Nothing.  In fact, that's exactly what I would expect them to do.
Q  (By Mr. Griffin) Okay.  All right.  And in terms of your understanding of what accommodations are, is actually making adjustments and waiving or amending requirements; right?

### Pg: 70 Ln: 6 - 14

**Annotation:**

THE WITNESS:  Yes.
Q  (By Mr. Griffin) Okay.  And I know you're not the HR manager, but being involved as you are, as long as you have been, that that's the purpose of an accommodation, isn't it, to vary some requirement or policy that allows a worker with a disability to work successfully?
MR. FARMER:  Same objection.
THE WITNESS:  That's the way I see it.

### Pg: 70 Ln: 21 - Pg: 71 Ln: 15

**Annotation:**

Q  (By Mr. Griffin) You know what he said.
A  I do know what he said regarding Ernest. Again, I don't understand the issue, which is why he and I had a disagreement.  I don't understand what's wrong with this accommodation, because it's exactly what I would have done, except that I would have, as a manager,

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

---

**Pg: 70 Ln: 21 - Pg: 71 Ln: 15** continued...

**Annotation:**

made sure that I can fit it within the job description
or have to create a new job description so that I don't
have a potential conflict between two employees that
have the same job, but one gets to work in the shop and
the other does not, but that's a management due
diligence standpoint to manage this on the HR side,
which I believe is where Bill is or was, that it's not
about a person's ability to hear.  If we knew about his
hearing, we should have addressed this long before.
Everyone knew he was deaf.  We missed what was --
    Q   You had said he's deaf.  You meaning hearing
impaired?
    A   The proper way of saying it is everybody knew
he was hard of hearing.

---

**Pg: 72 Ln: 14 - 19**

**Annotation:**

    Q   Well, one thing that I'm curious about in terms
of Formosa's policies, because I understand it from Mr.
Laas that Formosa USA for this plant, there are no
policies whatsoever in writing about how Formosa
accommodates workers with disabilities.  Is he right,
there aren't any?

---

**Pg: 72 Ln: 22 - Pg: 73 Ln: 4**

**Annotation:**

    THE WITNESS:  There is an SOP that's in the
IH department, which is my group.  When I say IH
department, there's an SOP that covers it.  It has not
been exclusively followed.  It has not been well
published.  It's a guide more or less for my group to
take into consideration disabilities.  I'm not fluent on
it, but I am aware that it's there and it's not
exclusively followed.

---

**Pg: 74 Ln: 2 - 15**

**Annotation:**

    Q   (By Mr. Griffin) Well, help me understand.  You
have articulated very persuasively and from a common
sense point of view your thoughts about Ernest and his
accommodation, have you not?
    A   Yes.
    Q   And, as I understand it, other folks at
Formosa, without consulting with you, made a decision to
end his accommodation and send him over to utility
maintenance; right?
    A   Yes.

---

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

---

### Pg: 74 Ln: 2 - 15 continued...

**Annotation:**

74:12    Q   Okay.  Who at Formosa, from your understanding, where does the buck stop with this sort of decision-making that resulted in Ernest being sent over to utility maintenance?

### Pg: 74 Ln: 21 - Pg: 75 Ln: 11

**Annotation:**

74:21           THE WITNESS:  That's a good question.  From a legal -- if I was trying to answer it from a legal standpoint, I would think it would be the general manager and vice president that has the ultimate responsibility for administration in the facility because HR falls under his watch.
    Q   (By Mr. Griffin) But in any case with Ernest, this decision to end that accommodation and send him to utility maintenance was made without your knowledge; right?
    A   Yes.
    Q   And without your consent; right?
    A   Yes.
    Q   And had you been asked, it would have been over your objection?
    A   I did object.

### Pg: 75 Ln: 12 - 18

**Annotation:**

75:12    Q   Okay.  All right.  Once you knew about it?
    A   Once Ernest told me about it, --
    Q   Right.
    A   -- which apparently had already -- that communication had already been or a decision had been made, I expressed my complete dissatisfaction to the general manager.

### Pg: 75 Ln: 19 - Pg: 76 Ln: 4

**Annotation:**

75:19    Q   Okay.  And your thought is -- I don't want to put words in your mouth, but your thought is that in discussions about accommodations and how the employer deals with a worker with a disability that you or your department should be involved in that?
    A   If there's a disability involved, my department absolutely has to be.  It must be involved.  Of course, I'm in the same position as Bill is in.  We must be aware of that disability in order to act, or in Bill's case, must be aware of a need or some actual accommodation made for him to act.

---

## TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

---

**Pg: 76 Ln: 23 - Pg: 78 Ln: 3**

**Annotation:**

Q   So Bill knew that he had this disability, hearing loss; right?

MR. FARMER:  Objection.

THE WITNESS:  He had hearing loss.

Q   (By Mr. Griffin) And he also knew that he had been accommodated?

MR. FARMER:  Objection.

THE WITNESS:  He knew that before I did.

Q   (By Mr. Griffin) Right.

MR. FARMER:  Calls for speculation.

Q   (By Mr. Griffin) And he was unhappy with that?

MR. FARMER:  Objection, calls for speculation.

THE WITNESS:  Yes.

Q   (By Mr. Griffin) And, ultimately, without your knowledge or consent, he was sent over to utility maintenance?

MR. FARMER:  Objection, lack of foundation, misrepresents the record.

THE WITNESS:  Yes.

Q   (By Mr. Griffin) Okay.  Would you say, Shane, that in your conversations with Bill about Ernest that he clearly had a bias against him?

MR. FARMER:  Objection, vague, calls for speculation.

THE WITNESS:  Initially, I thought Bill's reaction was not biased in any way.  It was maybe frustration by the fact that management had made an accommodation of being an accommodation like this without Bill's knowledge.  Later, I became convinced he was biased.

---

**Pg: 78 Ln: 20 - Pg: 79 Ln: 15**

**Annotation:**

Q   (By Mr. Griffin) In terms of your words or your sentiment to Ernest during 2017, when you went and got the hearing aids, did you share with him words to the effect of that, "If you get this audiogram and get your hearing within 40 decibels, Bill will have to take you back," or words to that effect?

A   Yes.  In fact, that was basically the conversation I had with more than once, and that's when I told him that, "You need to make absolutely sure when you do return that you bust your ass."

Q   Sure.

A   And so from that led to the conversation, "Well, of course, I do."

Q   Right.

A   "Why would you say that?"

---

## TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 78 Ln: 20 - Pg: 79 Ln: 15** continued...

**Annotation:**

79:10   Q   Right.
A   So I informed him of what Bill said, "Because if you are coming back here and you don't bust your ass, don't give Bill a reason to fire you," because I was very convinced by that point that that's exactly what was going to happen.

**Pg: 81 Ln: 12 - 18**

**Annotation:**

81:12   Q   (By Mr. Griffin) Well, since he's objected, I want to make sure I understand the fact.  He may have heard it differently than I did, but I thought, first, Ernest got -- they showed him the email where he was going to utility maintenance?
A   Yes.
Q   And then he went to Bill Laas' office?

**Pg: 81 Ln: 20 - 22**

**Annotation:**

81:20         THE WITNESS:   Yes.
Q   (By Mr. Griffin) And he told you?
A   Yes.

**Pg: 81 Ln: 24 - Pg: 84 Ln: 11**

**Annotation:**

81:24   Q   (By Mr. Griffin) Okay.  Then he went to see Dr. Crowley?
82: 1   A   Yes.
Q   And Dr. Crowley gave him a note that said he could go on disability?
MR. FARMER:  Objection, speculation.
THE WITNESS:   Yes.
Q   (By Mr. Griffin) Okay.  So we got the chronology right?
A   (Witness nodding head).
Q   You're nodding, but I guess you got to make sure.
A   I'm nodding.  I'm thinking, I'm sorry.  I'm in my head still.
Q   No worries.
A   I'm thinking, going through the progressionary steps -- well, that's the original question of what I was trying to avoid without trying to go specifically through all the steps, but my goal was trying to avoid this right here at this moment.
Q   Well, in all times, you were trying to do that?
A   Yes.

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 81 Ln: 24 - Pg: 84 Ln: 11** continued...

**Annotation:**

Q   Even when Bill called him a fat, lazy Mexican, you were trying to intervene even then, were you not?

A   There was multiple worse-case scenarios that this was going to bring about.  One is, is that because of all the stuff that happened before I was asked if I knew he was deaf, is that, "The man has been discriminated against, and if we don't keep this man at work, he's going to sue our ass," and, in my opinion, was going to win.

Number two, he's the only guy that that unit has with any experience, and that unit has a terrible record.  When it comes to electrical management, he's the only one that knows where the crap is buried, and you don't want to lose the knowledge.

Number three, he's a very hardworking man, and why would you want to continue to allow this man to work when we have other people out here who have been accommodated, just like he has by his management, and no one has questioned anything until now.

Number four, if we go down this road, we're gonna have to do light time with everybody else out there with his condition that have also probably been out there for many, many years, and knowing we had somebody out there already that was born disabled that was working out there in just as a high-noise unit with an escort in the '90s.

And so, to me, this was a bad situation that was only going to get worse, and that we needed to do whatever we needed to get this man to work -- back to work, and I actually liked him having that mowing contract, because we couldn't get that work cheaper done anywhere else, and that I did not want him to lose that, and from a personal side, I didn't want him to lose that, because I know how much it meant to him, and so that was the other disagreement that I had with Bill.

Just cut to the chase and that was it, but you put somebody on short term, you cannot work out there as a contract, and I understand that, but all that was completely unnecessary if we just accepted Rey Tuazon and James Yeh's accommodation, period, because he was not in danger, and that's the end of it.

**Pg: 84 Ln: 16 - 25**

**Annotation:**

Q   But in terms of Ernest, you know good and well Ernest did not want to go on disability leave?

A   No.

MR. FARMER:  Objection, calls for speculation.

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 84 Ln: 16 - 25 continued...**

**Annotation:**

84:21            THE WITNESS:  He told me that multiple
times.
        Q    (By Mr. Griffin) He wanted to continue in the
same job that he was doing?
        A    Sure, he did.

**Pg: 85 Ln: 5 - 15**

**Annotation:**

85: 5            Q    (By Mr. Griffin) That's what Ernest told you?
        A    Well, I don't know how many times I talked to
Bill or how much he did to try to convince Bill of that
in terms of not wanting to go on short term or whatever,
but he made it very clear to me that he never wanted to
go on short term.  He did not want to lose his contract.
He wanted to continue to work out until he reached the
age that he felt like he could retire.
        Q    And he shared with you that he went to Dr.
Crowley to get that note to go on disability to avoid
being fired at utility maintenance?

**Pg: 85 Ln: 18**

**Annotation:**

85:18        A    Yes.

**Pg: 85 Ln: 21 - Pg: 86 Ln: 12**

**Annotation:**

85:21            Q    (By Mr. Griffin) Are there any other Formosa
management folks you have visited with about Formosa's
decision to end his accommodation at VCM and place him
in utility maintenance?
                MR. FARMER:  Objection.
86: 1                THE WITNESS:  The only conversations I had
about that, other than with Ernest and our legal
representation is with my staff, and when I learned
about it, I called medical.  It was Diane or Cassie.  I
don't remember.  I talked to my manager.  I talked to
IH, Pat Sullivan.  My manager is Stephen Phillips, who
is over that, and discussed it with him.
                I said, "Is there any possible way that
we could allow Ernest to be transferred to that unit,
knowing now what his hearing condition is and what his
job description is?"  And the conclusion was absolutely
no way.  We could never allow that.

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 87 Ln: 2 - 10**

**Annotation:**

87: 2      Q    (By Mr. Griffin) Have you ever heard the
saying, "If it ain't broke, don't fix it"?
      A    Yes, many times.
      Q    And with respect to the accommodation that was
successfully implemented for Ernest for those years,
would you say that the events that followed those
conversations with Mr. Laas on the phone and in your
office actually took a situation that was working and
actually broke it?

**Pg: 87 Ln: 13**

**Annotation:**

87:13                THE WITNESS:  Yes.

**Pg: 87 Ln: 22**

**Annotation:**

87:22  EXAMINATION BY MR. FARMER:

**Pg: 95 Ln: 11 - 24**

**Annotation:**

95:11      Q    But it's possible that Bill Laas and other
folks in HR didn't know exactly how bad Ernest's hearing
loss was; is that correct?
                MR. GRIFFIN:  Objection, form.
                THE WITNESS:  Bill knew, because I told
him.
      Q    (By Mr. Farmer) Okay.  So, at some point, you
told him how bad?
      A    And medical, too, I'm sure, because we had
several group meetings about Ernest's situation, and
then, okay, I had my staff pull records on 100 percent
of our employees, because who else has hearing that bad.
So Bill was made aware how many employees we had that
were above 40-decibel loss.

**Pg: 95 Ln: 25 - Pg: 96 Ln: 12**

**Annotation:**

95:25      Q    But this was after -- this was later in 2016?
96: 1      A    I don't know what year it was, but it was -- as
we were getting into where this is going to be our -- if
we're gonna go down this road with Ernest, then if we're
gonna make this company policy, then this applies to
everyone, and so, "Bill, you realize there's this many
employees, including individuals that were injured with
Ernest on the day back in 1998 or whatever, 1987 or '88,
whenever that injury initially occurred."  Ray Green,

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 95 Ln: 25 - Pg: 96 Ln: 12** continued...

**Annotation:**

he's still out there.  He was hurt the same time.  So I made sure Bill knew about what we was about to get into if he wanted to go down this road.  Just how bad is it? It's bad.

**Pg: 102 Ln: 22 - Pg: 103 Ln: 16**

**Annotation:**

Q    (By Mr. Farmer) Do you have anything to do with -- never mind, strike that.
        When Bill made his comment about Ernest being a fat, lazy Mexican, Ernest was not in the room; correct?
A    What?
Q    Ernest was not in the room when Bill made his comment?
A    About?
Q    You said Bill said that Ernest was a fat, lazy Mexican?
A    Oh, that comment.
Q    Ernest was not in the room --
A    No, he was not.
Q    Let me finish just so I can get a clean record. Bill was not in the room when that comment was made? I'm sorry, Ernest was not in the room when that comment was made?
A    Ernest was not in the room when Bill made that comment, either time.

**Pg: 103 Ln: 22 - Pg: 104 Ln: 14**

**Annotation:**

Q    Did you tell anybody at Formosa about that comment when it happened?
A    Yes.  I don't know if it was immediate.  The door was open, but I didn't have a discussion with my staff until, you know, two or three times, and I don't remember exactly when that was, but, you know, the general discussion of how this was going, you know, and I expressed my concern to my managers about that, both with Sammy Grimaldo and Stephen Phillips.
Q    When you say managers, you are referring to their job title, but they are under you; is that correct?
A    Yes.
Q    Did you ever report it to Rick Crabtree?
A    No.
Q    Did you ever report it to Bill's manager or Bill's boss?
A    Bill fired his boss.

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

---

**Pg: 105 Ln: 7 - 13**

**Annotation:**

Q   (By Mr. Farmer) Well, my question was whether you told anybody above you in the chain of command about that comment?

A   Yeah, John Pastuck.

Q   And that was after Ernest had filed this lawsuit?

A   Yes.

**Pg: 106 Ln: 19 - 23**

**Annotation:**

Q   Okay.  You would agree with me that when Ernest was in the shop, he wasn't performing a typical duty of an electrician; is that true?

MR. GRIFFIN:  Object to the form.

THE WITNESS:  No, it's not true.

**Pg: 107 Ln: 5 - Pg: 108 Ln: 5**

**Annotation:**

do.

Q   He was performing electrical work?

A   In the shop.

Q   Ernest did a lot of mowing and shredding for safety; right?

A   Yes.

Q   Do you know if he wore hearing protection while he was on his tractor?

A   I observed that he did, and I told him numerous times to make sure he did, as well as his FRC, which he did, safety glasses, because he understands that I have very strict policies when it comes to contractors, any contractor.

Their injuries are just as important to us as our employers are, and I also knew how embarrassing it would be if a Formosa employee was injured as a contract person out there.  I was very -- but I also confirmed with HR that it was not a conflict of interest of having him out there doing that work.

Q   You're aware -- are you aware that Formosa has a policy prohibiting employees from working outside of employment, if they are accepting short-term disability benefits?

A   Yes, I learned about that with Ernest's case.

Q   Did you ever discuss that policy with Ernest?

A   Yes, after the fact.

## TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 108 Ln: 14 - 16**

**Annotation:**
108:14    Q    Did he have a response when you brought it up
with him?
A    He was very upset about it, very upset.

**Pg: 110 Ln: 13**

**Annotation:**
110:13    REEXAMINATION BY MR. GRIFFIN:

**Pg: 111 Ln: 5 - 17**

**Annotation:**
111: 5    Q    But as just a de facto of what actually
happened, -- and if you don't know, it's okay -- are you
aware that when Ernest went back to work that he went
back to doing the same sorts of things he was doing
before he got the hearing aids?
A    Well, certainly that, plus I would think --
yes.  The short answer is yes.  He returned to work back
to what his job description allowed him of what his
manager asked him to do.
Q    Okay.  And before the hearing aids, he was
primarily working indoors and away from high-noise
areas?
A    Yes, that's my understanding.

**Pg: 111 Ln: 25 - Pg: 121 Ln: 5**

**Annotation:**
111:25    Q    He's doing the same daily tasks he was doing
112: 1    before he got the hearing aids?
A    Yes.
Q    Okay.  Fair enough.  And I want to also ask you
to go back to a statement.  I think that he asked you a
question.  You said someone told you to be careful what
you tell Ernest?
A    Yeah.
Q    Who told you that?
A    Bill.
Q    Why would he tell you that you should be
careful about what you tell Ernest?
A    There's a real story behind that one.
Q    Let's have it.
A    Well, Ernest is back to normal work duty.  This
happened this year.  He comes by my house after he had
went over to a mutual friend of his and mine, swung by
my house about 7 o'clock in the evening.  I want to say
it was a Sunday.
Q    This is Bill or Ernest?
A    Ernest.

## TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 111 Ln: 25 - Pg: 121 Ln: 5** continued...

**Annotation:**

112:21    Q    Okay.

A    Ernest comes to my house.  We go out to the front porch, which we always do.  Why?  Because Ernest and I -- he and I have conversations that's loud, and my wife gets irritated by that.  So we sit out on the porch and that way he can speak freely, and his eyes are bloodshot, clearly stressed, and he's on edge, and he's sitting on the edge of his chair.

He says, "Look, I got to get something off my chest I need to tell you," and that's an incident that happened.  He says, "Burgundy," which is my nickname, he says, "Burgundy, I got to tell you, but I know in your position, if I tell you this, you're gonna have to do something about it, but I have to get it off my chest."

And so he tells me about an incident where there was an arc flash in one of the motor control centers that hurt, why, he and a young contract technician, who had about five months of experience working for Turner Industries, named Justin.  I don't know his last name.  They had a significant arc flash that slightly injured the contract employee.

And so I said, "Look, you are protected by the Whistle-blowers Act.  You have an obligation to report safety incidents by procedure, and you know where I stand, but at the same time, there cannot be a reprisal against you for reporting a safety incident.  So tell me about this situation.  Feel free to tell me."

He told me about what had happened.  What he told me was, he says, "Look," he says, "You know, if we don't do something about this, this young man is going to be dead before the end of this year, because he knows nothing."

Okay.  And based on how they left the condition of the high-voltage breaker without checking it, because it didn't go to ground and trip the breaker, that it was sitting there waiting to kill someone, and I wanted to know, "Why didn't you report this?"

And he said, "Well, I'm concerned about -- I'm concerned about if Bill finds out about this, he's going to fire me."

And I said, "No.  Bill can't fire you over reporting the incidents, Ernest.  That's the wrong way of thinking about it.  Did you tell your supervisor"?

"Yes."

"Okay.  Well, that's good.  Did you tell your manager?"

"Yes, I told my manager."

"Okay.  Who are they?"

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

---

**Pg: 111 Ln: 25 - Pg: 121 Ln: 5 continued...**

**Annotation:**

114:21

He told me.  I knew Rey had been recently replaced by a kid named Daniel, never had met him.  So I said, "Ernest, you got nothing to worry about if you told your supervisor and manager.  Did they tell operations?  Did they tell my safety manager I had imbedded in that unit named David Peters?"

And he said, "The decision by the manager and the supervisor was that we were not going to tell operations about it."

"Well, did you tell them about your concern about the breaker?"

"Yes, I told him about that."

And I said, "Okay.  So what is the condition of the 480-volt cable?"

He said, "There was a hole in the jacket, which is why it arced when it hit us, a textile tack and screw."

He said, "We patched it."

I said, "Ernest, you did energize that breaker in order to make that repair.  You didn't make the check repair hot."

He said, "I have to be honest with you."  He said, "We did not."  He turned off the breaker.  We did it while the line was hot.  I told me and showed me how they did it.

I said, "Ernest, did you do that with the proper equipment?"

They did not.  "So why didn't you kill the breaker?"

He said, "Because the supervisor knew that if I killed the breaker, operations would have known about it, because we would have to get a permit, and they would ask, 'Why do you need this?' and then we would have to tell them about what happened."

Okay.  So I have an unreported incident.  I have management awareness.  I need to find out if this really happened the way Ernest said it was.

So the next day on Monday, I called the site superintendent for Turner and started off with the contract employee, who started off when he came in.  Did he tell the manager why?  I asked him how they powered it, and I wanted to know if there were potential injuries, and he says, "Yeah, I'm doing fine," whatever, which then I knew it did happen, because I didn't ask him did an incident occur.  I just asked how he was.

And so that was the first time Turner learned about this, too, and they have a very strict policy, which resulted in that kid being removed from site.

So I ended up meeting with the supervisor

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 111 Ln: 25 - Pg: 121 Ln: 5** continued...

**Annotation:**

and the manager and Ernest in the front of it with James Yeh present, which is when James Yeh went to their defense that, "Well, that's just the way we've always done it. We don't report."

I chastised all of them. That's when the manager and the individual, I want to say it's Zack or Darren, one of those two kids over there, that said -- they immediately went to blame Ernest, because Ernest didn't want to report it, and I browbeat both of those guys, both the supervision and management.

"In spite of Ernest having more experience, you are the supervisor and manager. You have an obligation. You have training that requires you to report immediately to operations when it happened and to safety, and so don't blame Ernest for this," but it was very obvious those two guys, for whatever reason, were wanting to do that.

Now, Ernest had been telling me that Bill would fire him, and that Zack and Darren were implants by Allen Rivas, and they were the troublemakers. I'm convinced that's probably true.

So I set out and said, "What I'm going to know if what Ernest is telling me about Bill and Allen, because I'm not going to call Bill and Allen, like I normally would, and say, 'Hey, we have an unreported incident over here.' You know that's a strict violation of policy if it weren't for someone being seriously disciplined or fired. I'm not going to say anything to them tonight." It was late in the afternoon. I said, "I'm waiting to see."

My prediction was if it's true and Ernest isn't very convincing, that somebody will be in my office knocking on the door the next morning from HR, wanting to know what happened, and there would be only one way they would know, and, that is, because I had browbeat those two guys that Ernest says are the ones that Bill and Allen had over there.

One of them, I think it's Zack, works for or one of those two guys, works for Allen, who is Bill's second in HR, works for him on the side, and he was apparently involved in all that with Ruben on all that mess.

So sure enough -- but before I left that day, I had made sure Daniel and James Yeh go over there and tell the operations manager what they did, and that they had not reported it, and I want it in writing and a witness statement that they did that, that they did report it. I wasn't going to do it for them, and I told James Yeh, the director, I said, "I expect you and," I said, "My manager, William, I want you to go look at

## TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 111 Ln: 25 - Pg: 121 Ln: 5** continued...

**Annotation:**

that breaker. I want you to look at that repair and verify and confirm it is safe, and then I want an incident report written by operations, and I want that thing by the end of the shift sent forward, because somebody's butt is going to be in a crack over this."

It was no later than 8:15, 8:20, the next morning I get a call from Bill Laas, and said, "Hey, I need to come to your office."

"Okay."

I knew right away. He shows up over at my office, and said, "Did something happen over in VCM yesterday? Did you talk to those guys?"

I said, "Yeah, I sure did. Close the door."

So I told him just what went on and, of course, he got madder and madder and madder and leaned forward towards the chair -- towards me, and I'm on the end of the chair, and at the ends he says, "And did you give out Daniel and Derrek about they shouldn't be blaming Ernest for it?"

I said, "Absolutely I did. That was clearly planned, based on the way they attacked that situation. Their supervisor, Bill, the manager, you know in spite of what an operator or technician thinks, an hourly employee, their management chose to cover this up, and their boss, James Yeh, supports that." I said, "You're damn right."

He said, "Did you tell Ernest that?"

I said, "I absolutely did."

He stands up. He says, "You do know that we were just issued a federal lawsuit or indictment yesterday?"

I said, "No. I did not know that. Who was it from?"

He said -- I said, "Who's suing us?"

He said, "Ernest."

I said, "On what grounds, what issue?"

He says, "Loss of that contract, and HR management referred to him as a fat, lazy Mexican to another management representative of the company."

I said, "Okay." I started laughing.

And he said, "So you better damn well be careful what you tell Ernest." He walked out, and I've had almost no conversation with him since, and that's been two or three months ago.

Q    Wow.

A    So that was the first time that I learned that there was a lawsuit where that issue of what Bill said to me, you know. He didn't say my name was listed, but he knew. ==He knew, and Christine confirmed that Bill==

## TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 111 Ln: 25 - Pg: 121 Ln: 5** continued...

**Annotation:**

knows that he told me that. So it's not like I had to go back --

MR. FARMER:  Objection, attorney-client privilege.

THE WITNESS:  Say that again?

MR. FARMER:  Strike that last answer.

THE WITNESS:  Huh?  What?

MR. GRIFFIN:  He interrupted your answer.

(The last three sentences of the answer were read back.)

**Pg: 121 Ln: 23 - Pg: 122 Ln: 11**

**Annotation:**

Q  (By Mr. Griffin) Oh, okay.  Well, let me make sure I understand.  You understand this nice, young man to my left is Formosa's lawyer; right?

A  Yeah, I understand.

Q  Not Shane Burgin's lawyer?

A  Yes, I understand.  I mean, obviously, if he's representing Formosa, I wouldn't be telling you all this.  Since we are talking, just me and you, and he's telling me to be quiet or not be quiet, he hasn't told me to shut up yet.

So my point is, is that Bill Laas had to have known that what Ernest was claiming in the lawsuit had to have occurred between him and I.  He had to have known that.

**Pg: 123 Ln: 7 - 14**

**Annotation:**

Q  And if I understand what you said that Allan Rivas -- is it Revas or Rivas?

A  Rivas.

Q  Allen Rivas is using some of these young, young electrical management people at his own private home?

A  Yeah.

Q  Okay.  And Rivas works for Laas; right?

A  Yes.

**Pg: 123 Ln: 18 - Pg: 124 Ln: 14**

**Annotation:**

Q  But Allen has to do what Bill tells him to?

A  Yes.

Q  Bill is his boss?

A  I don't think there's anything wrong with having an employee working for him on the side any more than if Ernest was working for me on the side.

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

---

**Pg: 123 Ln: 18 - Pg: 124 Ln: 14** continued...

**Annotation:**

Q   Sure.  I get that, but the chronology is you described it where one of Bill's implants was the person that you were speaking to, who was attempting to deflect the blame to an hourly basis employee, who had reported it to them?

MR. FARMER:  Objection, mischaracterizes his testimony.

Q   (By Mr. Griffin) Is that right?

A   Yes.

Q   In other words, as I understand it, Ernest is the hourly basis guy; right?  He reports it to his supervisors; right?

A   Yes.

Q   And the supervisors, his boss, attempt to blame the hourly basis guy?

A   Yes.

**Pg: 124 Ln: 15 - 25**

**Annotation:**

Q   Okay.

A   And James Yeh did, too, because he had the most experience.  He should know better, and Ernest should know better.  I chastised Ernest, too, terrible decision.

Q   Right.  It's the opposite of leadership and management for someone --

A   When the rub meets the road and I'm defending ourselves against the Department of Labor and an administrative law judge for things of this nature, it all comes down to management.

**Pg: 126 Ln: 18 - Pg: 127 Ln: 21**

**Annotation:**

Q   (By Mr. Griffin) Okay.  And you had mentioned the shredding contract, you were asked about that.  Tell us how good a job Ernest did with the shredding and the work that he did for Formosa Plastics in Point Comfort?

MR. FARMER:  Same objection.

THE WITNESS:  Well, I had numerous contractors.  I've had other departments manage this.  I never had anybody do as good a job as his company he did.  We had a lot of added value.

Q   (By Mr. Griffin) Is there any doubt in your mind that, but for the events in September 2016, that he would have continued to do the same good job for a good value for Formosa?

A   No doubt.

Q   And in this, whether you want to call it

---

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 126 Ln: 18 - Pg: 127 Ln: 21** continued...

**Annotation:**

127:   escapade tragedy, whatever it was, sending him over to
utility maintenance, in that whole scenario, such that
it was, Bill went around you?
          MR. FARMER:  Objection, vague.
          THE WITNESS:  Well, he didn't inform me.  I
guess -- yes, I guess that would be a fair statement,
but I don't know that he's -- Bill does not have to
consult with me to move somebody from, you know, one
department to another, unless it was based on some
medical condition in which I would be consulted.
     Q    (By Mr. Griffin) Well, I'm not arguing whether
he should have or didn't.  I'm just saying as a fact he
went around you?
     A    He didn't come to me.

**Pg: 129 Ln: 8 - 22**

**Annotation:**

129:        Q    Were you aware -- let me just ask you this or
share with you that their response to the EEOC accused
Ernest of creating a hostile work environment for
employees of Mexican descent?
          MR. FARMER:  Objection, mischaracterizes.
     Q    (By Mr. Griffin) Were you aware that Formosa
accused him of that to the EEOC?
          MR. FARMER:  Same objection.
     Q    (By Mr. Griffin) Have you ever in the years
you've known Ernest Villarreal for him to have a
prejudiced bone in his body?
     A    No, and that's ridiculous for anyone to assume
that, considering the fact he's also Hispanic.  His
family is Hispanic, and I know some of his family
members, and some of them are fresh across the river.

**Pg: 130 Ln: 2 - 17**

**Annotation:**

130:   2    Q    And did you know until today that Formosa took
the position to the EEOC that they wanted to move him
over to utilities so that he would be separated from
other Hispanic employees that were being harassed by
Ernest --
          MR. FARMER:  Objection, mischaracterizes
his statement.
     Q    (By Mr. Griffin) -- because of their race?
     A    I'm not aware of that.
     Q    Okay.  Do you know who came up with that idea
that it was really -- that he was really being sent over
there so that he wouldn't have to be treating people of
Hispanic descent in a bad manner?

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

---

**Pg: 130 Ln: 2 - 17** continued...

**Annotation:**

130:15         MR. FARMER:   Objection, assumes facts not
in evidence.
              THE WITNESS:   No.

**Pg: 132 Ln: 2 - 15**

**Annotation:**

132: 2     Q   If I understood before, sometime since -- at
some point in time, since when this suit was filed and
today, you have shared with Formosa's counsel the things
that Bill Laas has said about Mr. Villarreal; right?
              MR. FARMER:   Objection, attorney-client
privilege.  Don't answer it.
       Q   (By Mr. Griffin) No, you have to answer whether
you have told these lawyers the truth about what
happened?
              MR. FARMER:   Well, he can answer if he told
the lawyers the truth.  He cannot specify what he
specifically told.
              THE WITNESS:   I told the lawyers everything
I told you.

**Pg: 132 Ln: 21 - Pg: 133 Ln: 17**

**Annotation:**

132:21     Q   (By Mr. Griffin) I appreciate that.  He's got
to make objections and that sort of thing, but let me
ask you this:  Do you know how it is today that Mr. Laas
has not been investigated or disciplined for making
remarks like that about an employee?
133: 1         MR. FARMER:   Objection, assumes facts not
evidence, calls for speculation.
              THE WITNESS:   I wouldn't be brought into
that loop, like I used to be.  No one has talked to me
about it.  So other than who's in this room and a few
others, no one knows about it.  No one in management has
asked, and I haven't told them.
       Q   (By Mr. Griffin) But if they did ask, you would
tell them the truth?
       A   Of course, yeah.  Absolutely, I would tell the
truth.
       Q   Would you agree with me that that sort of
comment about a worker is completely intolerable?
              MR. FARMER:   Objection, asked and answered,
calls for speculation.
              THE WITNESS:   It's intolerable.  It's
unnecessary.  It's not professional.

## TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 134 Ln: 13 - Pg: 135 Ln: 6**

**Annotation:**

Q   (By Mr. Griffin) Exactly.  And is there anything else that you feel in fairness should be added in light of the conversations you and I have had, and that Mr. Farmer and you have had?

A   I think we pretty much covered it.  The other things merely points to the same thing.  I think that this situation is not good.  I worked with Bill Laas for a very long time on many cases.  I think every time we come to some, when we have, we come to the right conclusion.

I think the outcome where Ernest is involved was -- it did make us better, because we should not have had Ernest working out in those conditions with the type of hearing loss.

So, from a safety standpoint, it has brought about some positive change so that we are not just worried about the loss of hearing from the work exposure, but people in general, because it's something we just hadn't focused on.

**Pg: 139 Ln: 11 - 19**

**Annotation:**

Q   Well, I got what you're saying there, but in terms of your comment a moment ago about half empty or half full, I get your point about things have been made better in some ways because of this unfortunate thing that happened to Ernest, but structurally, though, Shane, what structurally is different to prevent Bill Laas from going around you again when he sees an accommodation made by co-workers that he didn't know about and that he doesn't like?

**Pg: 139 Ln: 22 - Pg: 140 Ln: 4**

**Annotation:**

THE WITNESS:  Nothing, and if the accommodation is solely based on some job unrelated to a medical or disability, Bill doesn't have to come to us, safety, but if it is involving some medical condition or disability, Bill should absolutely inform medical.

Q   (By Mr. Griffin) But what I'm asking you is what structurally has changed?

A   Nothing.

**Pg: 140 Ln: 19 - Pg: 141 Ln: 9**

**Annotation:**

Q   (By Mr. Griffin) Okay.  Okay.  And I'm assuming this is Mr. Lass' responsibility, but if it's not, whose

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 140 Ln: 19 - Pg: 141 Ln: 9** continued...

**Annotation:**

responsibility is it for Formosa to develop HR policies about accommodating workers and how people are to be given information about how to accommodate workers?
MR. FARMER:  Objection, calls for speculation.
THE WITNESS:  There is no organized effort or training orientation program for managers or supervisors on how to accommodate or not accommodate employees.  There's been very little effort to train management on any ADA, disabilities, equal employment law.  So, generally speaking, there's no structure that keeps a manager or supervisor from making a bad decision.  So I think a lot of what's going on at Formosa is based on instinct or practice.

**Pg: 141 Ln: 16**

**Annotation:**

REEXAMINATION BY MR. FARMER:

**Pg: 143 Ln: 17 - Pg: 144 Ln: 7**

**Annotation:**

Q  If I submit to you that it's confirmed later Bill Laas has a hearing loss, would it be ridiculous to assume he's biased against people with hearing loss?
MR. GRIFFIN:  Object to the form.
THE WITNESS:  I guess.  I don't think it has anything to do with his hearing loss.
Q  (By Mr. Farmer) Okay.  So you don't think the move from VCM to utilities had anything to do with Ernest's hearing loss?
MR. GRIFFIN:  Object to the form.
THE WITNESS:  I don't think that Bill was taking his hearing loss into consideration at all, because it makes no sense that you would.  If you knew that a man was hard of hearing, that you would move someone to a unit on purpose, if you were thinking and hearing it and his safety into consideration.

**Pg: 148 Ln: 16 - Pg: 149 Ln: 14**

**Annotation:**

REEXAMINATION BY MR. GRIFFIN:
Q  Okay.  Just a couple of questions.  You were asked about what was in Bill Laas' mind in moving Ernest to utility maintenance, and I thought I heard a question --
MR. FARMER:  I didn't ask that.  I'll object to that as a mischaracterization.

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

**Pg: 148 Ln: 16 - Pg: 149 Ln: 14** continued...

**Annotation:**

148:23  Q  (By Mr. Griffin) I thought you said -- maybe I misunderstood that you said I don't think Bill was thinking about his hearing or some such.  I just want to make sure that I understand or that I -- that I understand what was going on with respect to the events --

A  I'm going to give you my sense --

Q  Well, let me finish my question.

A  Oh, I'm sorry.

Q  You understand Ernest felt that Bill and/or James Yeh, however they decided who was going to make the decision, was going to stick him in utility maintenance as a way because of his hearing to make him fail in a high-noise area so that he could then be fired because his supervisor would be able to say that his hearing was bad.  Do you understand Ernest felt that he was being set up to be fired?

**Pg: 149 Ln: 17 - Pg: 151 Ln: 12**

**Annotation:**

149:17  THE WITNESS:  Yes.  I understood from Ernest that the way he was -- the way he understood that move, it was a setup, and that he got that information from Butch.

Q  (By Mr. Griffin) Sure.

A  And Rey.  I was not party to any of those discussions by management, so I don't know.  My reason of saying it -- that if I take out what Ernest is thinking, if I'm just looking at it in terms of, "Okay, I know Bill disagrees with the accommodation."

Q  Right.

A  Bill is now aware of his hearing condition.

Q  Yes.

A  And so any sane person would not move that person to the highest noise area where you know he's coming from a low-noise area if they were thinking about his hearing.  That's what I meant, is that it would have to be based on something else.

Maybe he is having personnel issues. Maybe there are other things coming out in the investigation that caused him to feel like I need to get him out of there.  Maybe, in fact, he's going to go over there and can't perform the duties because it's too difficult, because I also know somewhere in of all is that I was also, "Did you know he can read and write? He can't read and write."

"Yes, I know that."

And so if you go over utilities in cogen and you can't work over there because you're not

# TextMap Annotation Digest Report

**Case Name:** Ernest Villarreal vs. Formosa Plastics Corporation, Texas
**Transcript:** [11/7/2018] Burgin, Shane 11072018 Vol 1 of 1

---

**Pg: 149 Ln: 17 - Pg: 151 Ln: 12** continued...

**Annotation:**

familiar with the equipment and I can't read the procedures and I can't read the labels or whatever, I'm not going to be able to perform the job effectively, and they're going to run me off.

So that's how I was looking at it, because there's no way a sane person -- no sane person would possibly move somebody over there, knowing that he has a hearing condition.

Q   Unless they were trying to script him to fail?

A   I do not believe that.

MR. FARMER:  Objection, calls for speculation.

Q   (By Mr. Griffin) You didn't want to believe it, but today you believe it?

MR. FARMER:  Objection, calls for speculation.

THE WITNESS:  I suspect it.

**Pg: 152 Ln: 14 - 18**

**Annotation:**

Q   (By Mr. Griffin) No problem.  But you knew then, because you had conversations with Mr. Laas that he was hostile to the accommodation that Formosa had given Ernest because of his hearing loss?

A   Yes.